*Exhibit E*

**Colin McCabe**

```
                                                              1
 1              STATE OF MICHIGAN
 2     IN THE CIRCUIT COURT FOR THE COUNTY OF MACOMB
 3
 4                   *     *     *
 5
 6   MICHAEL LASKEY,
          Plaintiff,
 7                                Case No. 12-4704-NF
      - vs. -                     Hon. Peter J. Maceroni
 8   CITY OF WARREN,
 9        Defendant.
10   _____/
11
12
13   DEPONENT:   COLIN MICHAEL McCABE
14   DATE:       Tuesday, September 24, 2014
15   TIME:       12:02 p.m.
16   LOCATION:   29900 S. Civic Center
17               Warren, Michigan
18
19   REPORTED BY: JENNIFER DIANE CLAUSON, CSR-6867
20                Court Reporting Services
21                courtreportingservices@ymail.com
22                (248) 535-8277
23
24
25
```

**Colin McCabe**

```
                                                              2
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF MICHIGAN
 3                    SOUTHERN DIVISION
 4
 5                   *     *     *
 6
 7   MICHAEL LASKEY,
          Plaintiff,
 8                                Case No. 2:13-CV-14538
      - vs. -                     Hon. Arthur J. Tarnow
 9                                Mag. Paul J. Komives
     CITY OF WARREN,
10        Defendant.
11   _____/
12
13
14   DEPONENT:   COLIN MICHAEL McCABE
15   DATE:       Tuesday, September 24, 2014
16   TIME:       12:02 p.m.
17   LOCATION:   29900 S. Civic Center
18               Warren, Michigan
19   APPEARANCES:
20   SHAWN CABOT, ATTORNEY AT LAW
21   Christopher Trainor & Associates
22   9750 Highland Road
23   White Lake, Michigan 48386
24   (248) 886-8650
25      Appearing on behalf of the Plaintiff.
```

**Colin McCabe**

```
                                                              3
 1   APPEARANCES CONT.
 2
 3   RAECHEL BADALAMENTI, ATTORNEY AT LAW
 4   ROBERT J. MORRIS, ESQUIRE
 5   Kirk, Huth, Lange & Badalamenti
 6   19500 Hall Road, Suite 100
 7   Clinton Township, Michigan 48038
 8   (586) 412-4900
 9      Appearing on behalf of the Defendants.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Colin McCabe**

```
                                                              4
 1                    {I N D E X}
 2   WITNESS                                  PAGE
     -------                                  ----
 3     COLIN MICHAEL McCABE
 4   Examination by Mr. Cabot.............5
 5   Examination by Mr. Morris............63
 6   Re-examination by Mr. Cabot..........66
 7
 8                    *   *   *
 9
10
11   E X H I B I T S             PAGE # MARKED
     ---------------             -------------
12   Teolis Deposition Exhibit No. 2..53, 55, 65, 66
13    (Mentioned)
14
15
16
17
18
19
20
21
22
23
24
25
```

**Colin McCabe**

13

1   Walker?
2   A. Lake Odessa.
3   Q. And why did you leave City of Walker?
4   A. I was released from probation due to accidents.
5   Q. And when did you start at Odessa?
6   A. July or so --
7   Q. Of 2000 --
8   A. July of 2002.
9   Q. How long was that?
10  A. About eight months.
11  Q. So early part of '03 then?
12  A. May.  Yeah, I left -- I started at Wayne State May
13     18th or May 19th, 2003.
14  Q. And then how long did you work at Wayne State?
15  A. Five years.
16  Q. So 2008?
17  A. Yes.
18  Q. Reason for leaving Lake Odessa?
19  A. To gain full-time employment.
20  Q. Lake Odessa was part-time?
21  A. Yes.
22  Q. Patrol officer?
23  A. Yes.
24  Q. Wayne State full-time?
25  A. Yes.

**Colin McCabe**

14

1   Q. Patrol officer?
2   A. Yes.
3   Q. Reason for leaving?
4   A. To go to the City of Warren.
5   Q. When did you begin there?
6   A. May 19th, 2008.
7   Q. And you're there presently?
8   A. Yes.
9   Q. Capacity?
10  A. Police officer.
11  Q. Any rank?
12  A. Police officer.
13  Q. No supervising cap -- I mean authority?
14  A. No, those would be promotions.
15  Q. Ever been the subject of an Internal Affair's
16     investigation while at Warren?
17  A. Yes.
18  Q. How many?
19  A. I'm not sure.
20  Q. More than 10?
21  A. Any of the complaints -- citizen complaints they get
22     routed if they make it, they go to Internal
23     Affair's.  So I don't know.  If we don't -- if it's
24     not founded or we don't do an investigation or an
25     interview, then we don't -- a lot of them we don't

**Colin McCabe**

15

1   know about.  So --
2   Q. Okay.  We're here to talk about an incident
3      involving Mr. Laskey which occurred on October 31st,
4      2011.  You were working with your partner, Kimberly
5      Teolis, is that correct?
6   A. Yes.
7   Q. Was she your regular partner?
8   A. Yes.
9   Q. Okay.  You were driving that day?
10  A. Yes.
11  Q. And Teolis was the front seat passenger?
12  A. That's correct.
13  Q. My understanding is that on this occasion, you were
14     called out at your normal sector that you worked
15     at --
16  A. That's correct.
17  Q. -- is that correct?
18  A. Yes, that's correct.
19  Q. And the reason for that was?
20  A. We got a peeping Tom run on the north end of the
21     city.
22  Q. Was any description given of this peeping Tom at the
23     time you were dispatched?
24  A. Yes.
25  Q. And what was that description?

**Colin McCabe**

16

1   A. It was a known suspect.  So I don't remember the
2      exact description.  It was a younger male wearing a
3      black and white jacket.
4   Q. Now, when you say it was a known suspect, what does
5      that mean?
6   A. The person who called in the complaint knew who it
7      was.
8   Q. Okay.  Did they give a name?
9   A. Yes.
10  Q. And what name did they give?
11  A. I would have to refer to my report.  I think it's --
12     I don't remember the exact name.
13  Q. Did you draft a report?
14  A. No.
15  Q. Okay.  So when you say my report, you're referring
16     to Officer Teolis, correct?
17  A. That's correct?
18  Q. With respect to this incident, did you author any
19     reports at all?
20  A. No reports, no.
21  Q. Okay.  Did you complete any use of force reports?
22  A. I don't remember.
23  Q. Does Warren have a use of force report back in
24     October of 2011?
25  A. Yeah.

**Colin McCabe**

17

1  Q. Okay. And when are you supposed to fill that out?
2  A. When force is used. It's -- it's a -- it's up to
3     each officer whether they deem it like necessary to
4     do a use of force report. If the force uses -- is
5     enough to like warrant a use of force report. So
6     like if injury is likely or anything like that.
7  Q. So basically the policy of Warren is the officer
8     gets to choose if they do a use of force report,
9     it's up to their discretion?
10 A. Well, there are set specific guidelines for a use of
11    force report, but like minimal stuff like muscling
12    techniques, it depends on whether you figure that
13    that's enough to warrant a use of force report.
14 Q. So again --
15 A. Like pulling someone's arm back can go either way.
16 Q. Again, discretion?
17 A. Yes.
18 Q. To the officer?
19 A. Yes.
20 Q. Two officers could be on the scene, see the same
21    thing, one might think you should write a report,
22    the other might not think so, correct?
23 A. Sure.
24 Q. In this case, you've already talked about muscling
25    techniques. So obviously you've already read the

Court Reporting Services
courtreportingservices@ymail.com - (248) 535-8277

**Colin McCabe**

18

1     incident report because that's the phrase used
2     there. So you've read the report today, correct?
3  A. That's correct.
4  Q. Should there have been a use of force report done?
5  A. I did not -- I don't believe I completed one. So I
6     did not do one.
7  Q. Okay. Who would do a use of force report, you or
8     your partner?
9  A. Either.
10 Q. Okay. In your opinion, should one have been done?
11 A. No.
12 Q. And why not?
13 A. The force used to effect an arrest in this was very
14    minimal. Just pulling his arms back, rolling him
15    over.
16 Q. Other than this being a known suspect, any other
17    information you were given from dispatch; race,
18    gender, age?
19 A. Yeah, they gave --
20 Q. Clothing wearing?
21 A. Yeah, as I said earlier, it was a -- they gave a
22    clothing description and an age and a name.
23 Q. The report indicates a white male, 21, does that
24    sound about right?
25 A. Yes.

Court Reporting Services
courtreportingservices@ymail.com - (248) 535-8277

**Colin McCabe**

19

1  Q. Name of David McKenna, do you remember that?
2  A. Yes.
3  Q. That perpetrator is wearing a black and white jacket
4     looking in a window, correct?
5  A. That's correct.
6  Q. Any description of height, weight given?
7  A. I don't remember.
8  Q. And when you got the run, you and your partner
9     proceeded to go to the area of 28640 Newport, is
10    that correct?
11 A. That's correct.
12 Q. And while at -- did you ever make it to that
13    location?
14 A. No.
15 Q. Okay. While en route to that, you saw my client, is
16    that correct?
17 A. That's correct.
18 Q. And at the first time you would have seen him would
19    have been at a distance, correct?
20 A. Yes.
21 Q. Okay. Was -- were the two of you heading toward
22    each other?
23 A. Yes.
24 Q. Okay. And do you remember where -- what direction
25    you were heading?

Court Reporting Services
courtreportingservices@ymail.com - (248) 535-8277

**Colin McCabe**

20

1  A. I was heading east.
2  Q. East on what street?
3  A. Martin.
4  Q. So he would be heading west on Martin?
5  A. Correct.
6  Q. And where was -- what was he riding?
7  A. He was riding a bicycle.
8  Q. Was it a pedal bike?
9  A. It was a motorized bike.
10 Q. Okay. Did you see the motor?
11 A. No.
12 Q. How do you know it was motorized?
13 A. Because we took it to the station and he wasn't
14    pedaling as we chased after him.
15 Q. Did you see a motor?
16 A. No.
17 Q. Did you see a chain?
18 A. I don't remember.
19 Q. You didn't look, did you?
20 A. No.
21 Q. Okay. Did you hear anything? Did the bike make any
22    noise?
23 A. I don't recall.
24 Q. Did the bicycle have any type of flashers or
25    anything like that?

Court Reporting Services
courtreportingservices@ymail.com - (248) 535-8277

Colin McCabe

21

1  A. I don't believe so.
2  Q. Any reflectors that you recall?
3  A. No.
4  Q. So the first time you see him the two of you are
5     heading toward each other and where is he on his
6     bike at?  Is he in the street, sidewalk?
7  A. He's on the sidewalk on the north side of Martin.
8  Q. And as you approach him, does there come a time when
9     you approach him?
10 A. Yes.
11 Q. Okay.  How close do you get at that point?
12 A. I pulled to the north side curb as he's riding up to
13    me and I tell him to stop.  I roll down my window
14    and told him to stop.
15 Q. How close are you?
16 A. 20 feet.
17 Q. You're still moving at that point?
18 A. No, I pulled to the north side curb and stopped.
19 Q. So did you pull ahead of him or how --
20 A. I pulled in front of him.  He's coming towards me,
21    so I just stopped short and let him come to me.
22 Q. Okay.  Did he slow down at all?
23 A. No.
24 Q. Did you identify yourself as a police officer?
25 A. I did not, no.

Colin McCabe

22

1  Q. Your window down?
2  A. Yes.
3  Q. What'd you say?
4  A. Stop.
5  Q. Did he have a response?
6  A. No.
7  Q. So he didn't -- did he give you any gestures,
8     anything like that?
9  A. No.
10 Q. So he just kept on going?
11 A. Yes.
12 Q. Did he speed up or go at the same pace?
13 A. Same pace.
14 Q. How many times did you tell him to stop at this
15    point?
16 A. Just once.
17 Q. Were you in a fully marked police car?
18 A. Yes.
19 Q. Where were the emergency lights located?  Were they
20    in the grille, were they in the front window dash,
21    were they on top?
22 A. They're on top.
23 Q. Okay.  Have all the markings and emblems of a
24    standard police car?
25 A. Yes.

Colin McCabe

23

1  Q. And you were dressed how?
2  A. In a full uniform like I was -- like I am today.
3  Q. Okay.  And it's dark navy blue with the arm patches,
4     badge, duty belt, gun, handcuffs, stuff like that?
5  A. That's correct.
6  Q. What did you do when Mr. Laskey passed you?
7  A. I did a u-turn.  I came back out to Hoover.  At this
8     point, he was through Hoover.  I activated my
9     overhead lights, went through Hoover, and then I
10    pulled along side of him.  And at this point, he's
11    now on the south side of the road on the sidewalk on
12    Hoover.
13 Q. Okay.  Let's stop you there.  So you activate your
14    overhead lights.  Do you keep your overhead lights
15    on or do you just activate them when you go through
16    the intersection?
17 A. I'm not sure.
18 Q. So you don't know if you kept them on or not?
19 A. I don't.
20 Q. Okay.  Did you ever give a horn burst?
21 A. No.
22 Q. Siren burst?
23 A. No.
24 Q. Ever activate your sirens?
25 A. No.

Colin McCabe

24

1  Q. Ever go on the loud speaker?
2  A. No.
3  Q. So you do a u-turn and you come up along side of
4     him, correct?
5  A. Yes.
6  Q. Okay.  He is on the sidewalk again?
7  A. Yes.
8  Q. And he's going what direction on what street at this
9     point?
10 A. He's still on Martin.  He's traveling westbound on
11    the south side of the street.
12 Q. And can you estimate how fast he was going?
13 A. Not very.  Bicycle speed.
14 Q. Okay.
15         MR. MORRIS:  Objection, speculation.
16 Q. (BY MR. CABOT):  You were driving, right?
17 A. Yes.
18 Q. Did you ever look at your speedometer and see how
19    fast you were going when you pulled up to him?
20 A. No.
21 Q. Can you give me an estimate?  Was it more or less
22    than five miles an hour?
23         MR. MORRIS:  Objection, speculation.
24 Q. (BY MR. CABOT):  Go ahead.
25 A. 10 miles an hour maybe.

**Colin McCabe**

25

1  Q. Pardon?
2  A. 10 miles an hour maybe.
3  Q. Do you think it was more than that?
4  A. I don't know.
5      MR. MORRIS: Continuing objection on this
6  line.
7  Q. (BY MR. CABOT): So you pull up to him, he's on the
8  sidewalk again, right?
9  A. Correct.
10 Q. Okay. Does he have a hat on?
11 A. I don't know.
12 Q. Does he have any bags with him like lunch boxes,
13 backpacks, bags?
14 A. I don't know.
15 Q. So what do you do when you pull up to him?
16 A. Continue -- I told him to stop again.
17 Q. Did you announce yourself as a police officer at
18 this time?
19 A. No.
20 Q. How many times did you tell him to stop at this
21 point?
22 A. Just once.
23 Q. And what response, if any, was given?
24 A. He says no, I'm going to work.
25 Q. Any reason to dispute that?

**Colin McCabe**

26

1  A. No.
2  Q. He didn't say anything like fuck you or get out of
3  my face pigs or anything like that, did he?
4  A. No, sir.
5  Q. Okay. Did he speed up at this point?
6  A. No.
7  Q. So he's going at the same pace he has been?
8  A. That's correct.
9  Q. So he says no, I'm going to work, and then what
10 happens?
11 A. I hit him with my spotlight and tell him to stop
12 again.
13 Q. And -- now, when you hit him with the spotlight, you
14 -- are you still along side of him or are you behind
15 him at this point?
16 A. We're roughly in the area like along side of him.
17 I'm not sure if we were behind him or next to him or
18 --
19 Q. Okay. Did you shine the spotlight on him so it hits
20 his eyes do you presume?
21 A. Yes.
22 Q. Okay. It's a pretty sharp -- it's a pretty bright
23 light, isn't it?
24 A. If you look at it.
25     MR. MORRIS: Objection, form.

**Colin McCabe**

27

1  Q. (BY MR. CABOT): And you shined it on his face
2  though?
3  A. Shined it on him. It's not a directed beam. It's a
4  large --
5  Q. Right.
6  A. -- dome light.
7  Q. But the dome light that bright light would hit his
8  face and eyes, wouldn't it?
9  A. Yes.
10 Q. Okay. So you tell him to stop again. Any verbal
11 response to that?
12 A. He just said no.
13 Q. Okay. Does he speed up or does he maintain the
14 speed approximately?
15 A. He maintains the same speed.
16 Q. Okay. He doesn't tell you to fuck you, get out of
17 here, nothing like that, does he?
18 A. No.
19 Q. Doesn't threaten you or your partner in any way,
20 correct?
21 A. Nope.
22 Q. Doesn't do anything physical or throw anything at
23 you guys, nothing like that, right?
24 A. No.
25 Q. Okay. So then what happens?

**Colin McCabe**

28

1  A. I pull onto Santa Ana, which is approximately two
2  houses in front of him and stop in front of the
3  sidewalk.
4  Q. So if I understand correctly then, you would pass
5  him?
6  A. Yes.
7  Q. And so you would then -- your u-turn would be to the
8  left?
9  A. It's not a u-turn. It's just a left turn.
10 Q. Okay. So you made a left turn onto what street?
11 A. Santa Ana.
12 Q. And in doing that, making that left turn, that would
13 cut off his path of travel, correct?
14 A. That would put me in front of his path of travel,
15 yes.
16 Q. Okay. When you made that left-hand turn, can you
17 approximate for me the distance from your car to
18 where Mr. Laskey was?
19 A. He was a couple houses down still.
20 Q. Okay. Any estimate of distance?
21 A. Hundred feet.
22 Q. And once you turn onto Santa Ana, what do you do?
23 A. Stop.
24 Q. Complete stop?
25 A. Yes.

**Colin McCabe**

29

1  Q. And he's still on the sidewalk, right?
2  A. Yes.
3  Q. And when you make your complete stop, do you stop in
4     front of the sidewalk?
5  A. Yes.
6  Q. How far from the end of that sidewalk where going to
7     the road were you parked?
8  A. Three feet maybe.
9  Q. Spotlight still on at this point?
10 A. I don't know.
11 Q. Were your overhead lights still on at this point?
12 A. I don't know.
13 Q. If the spotlight was still on aimed at him, is it
14    possible somebody would have had --
15       MR. MORRIS: Objection, speculation.
16 Q. (BY MR. CABOT): Is it possible somebody would have
17    difficulty seeing?
18 A. If the spotlight hits him in the eyes?
19 Q. Yeah.
20 A. Sure.
21 Q. Okay. So my understanding is your vehicle comes to
22    a complete stop basically at the end of the sidewalk
23    and there's about a three-foot distance between the
24    car and what we'll call the side sidewalk curb --
25 A. Sure.

Court Reporting Services
courtreportingservices@ymail.com - (248) 535-8277

**Colin McCabe**

30

1  Q. -- is that accurate?
2  A. That's accurate.
3  Q. What happens next?
4  A. I waited for him to stop as were ordered to do so
5     and he tried to go around our police car striking
6     our police car.
7  Q. Now, when you made the complete stop, did you tell
8     him to stop again?
9  A. You mean aside from the other three times? No.
10 Q. Was it three times or twice? It doesn't matter. At
11    this point, I wanna know once you made that left
12    turn and stopped your car, did you tell him to stop
13    at any point subsequent to that?
14 A. No.
15 Q. Was there contact made with your car and Mr. Laskey?
16 A. Yes.
17 Q. Okay. Are you watching him the whole time?
18 A. Yes.
19 Q. Do you ever try to move your car out of his way?
20 A. No.
21 Q. Did it ever appear to you hey, this guy's not
22    stopping? Did it -- did you ever think that?
23 A. No.
24 Q. Did he slow down?
25 A. I don't think so.

Court Reporting Services
courtreportingservices@ymail.com - (248) 535-8277

**Colin McCabe**

31

1  Q. Okay. It never struck you to maybe try to move your
2     car out of his way?
3  A. No.
4  Q. Why not?
5  A. At this point, we were trying to effect a traffic
6     stop and he's fleeing from us. So at this point,
7     we're trying to get out and stop him.
8  Q. What -- what's he being -- what's he being arrested
9     for?
10 A. Well, the failing to pull over at this point. It's
11    just a reasonable suspicion stop at the point, but
12    as soon as he refuses, that's a crime. He already
13    refused three times not to pull over.
14 Q. So --
15 A. At this point, we're trying to detain him.
16 Q. So you're telling me that for investigatory stop,
17    he's under a legal obligation to stop and talk to
18    you?
19       MR. MORRIS: Objection, calls for a legal
20    conclusion.
21 Q. (BY MR. CABOT): Is that what you're telling me?
22 A. Yes.
23 Q. Okay. And your basis for that is?
24 A. Law.
25 Q. Okay.

Court Reporting Services
courtreportingservices@ymail.com - (248) 535-8277

**Colin McCabe**

32

1        MR. MORRIS: Again, objection, calls for a
2     legal conclusion.
3  Q. (BY MR. CABOT): So if I'm on the street and I'm
4     walking down the street let's say we go out to the
5     police station here today and I'm walking to my car
6     and you're on duty and you say hey, Cabot, stop, I
7     wanna talk to you, and I just keep going or I say
8     no, you can arrest me at that point?
9  A. The law allows me if I have reasonable suspicion to
10    stop somebody if criminal activity is afoot, that I
11    can stop somebody and their refusal to do so
12    constitutes a crime.
13 Q. And what was your reasonable suspicion? Did he
14    match -- match the age description?
15 A. He matched the description coming from the area of a
16    known peeping Tom.
17 Q. What description did he match of this peeping Tom?
18 A. He had a black and white jacket on.
19 Q. Okay. Other than that?
20 A. That's all we could see at five in the morning.
21 Q. Okay. When you were along side of him and within
22    feet of him, you couldn't determine an age?
23 A. No.
24 Q. Why not?
25 A. It's dark.

Court Reporting Services
courtreportingservices@ymail.com - (248) 535-8277

**Colin McCabe**

33

1  Q. You had your spotlight on him, you couldn't
2     determine an age at that point?
3  A. No.
4  Q. Why not?
5  A. I don't know.
6  Q. So you see him coming at you, you're stopped,
7     doesn't cross your mind that he's not gonna stop, I
8     need to move my car, right?
9  A. That's correct.
10 Q. So you don't move your car, right?
11 A. Nope.
12 Q. And how long had you been stopped fully between that
13    time and the time contact is made with the vehicle?
14 A. 10 seconds maybe.
15 Q. Okay. And what part of the vehicle does he hit?
16 A. The driver side quarter -- front quarter panel.
17 Q. And could you define to me what that means to you?
18 A. It's the piece of metal that goes over the wheel
19    well on the driver side between the door and the
20    bumper.
21 Q. Okay. So did he hit that wheel well part, the kind
22    of curve piece over the tire or did he hit somewhere
23    else in the quarter panel?
24 A. I'm not sure.
25 Q. Okay. Was there any damage to the vehicle?

**Colin McCabe**

34

1  A. No.
2  Q. Okay. You were in the car when he -- when there was
3     contact, right?
4  A. That's correct.
5  Q. Did you feel the car move?
6  A. No.
7  Q. Pardon?
8  A. No.
9  Q. Any idea why your partner said she felt the car
10    move?
11 A. I don't know what she said.
12 Q. Okay.
13       MR. MORRIS: Objection, calls for speculation.
14 Q. (BY MR. CABOT): So you didn't feel the car move
15    when contact was made, correct?
16 A. No.
17 Q. That's correct?
18 A. That's correct.
19 Q. Okay. What part of his bike hit the car first?
20 A. The wheel.
21 Q. The front wheel?
22 A. Yes.
23 Q. Okay. So it's kind of like a t-bone situation?
24 A. He tried to go around. So yeah, like t-bone angle.
25 Q. Why don't you describe what he tried to do from what

**Colin McCabe**

35

1     your testimony is?
2  A. He tried to make his way in between the sidewalk and
3     the three feet that's in between our car and the
4     sidewalk to go around our police car and in doing so
5     at the angle he took, he hit the front of our car.
6  Q. So according to your testimony, he's coming down the
7     sidewalk, you're about three foot away from the end
8     of the sidewalk and the curb there and so you would
9     what? Make sort of like a -- try to make a --
10    somewhat of a left turn?
11 A. Yes.
12 Q. And then the front wheel hits I think you said
13    around the wheel well?
14 A. That's correct.
15 Q. So that's the first part of the bike that hits the
16    car, correct?
17 A. Yes.
18 Q. Does any part of Mr. Laskey's body hit the car?
19 A. I don't know.
20 Q. Does Mr. Laskey do you see him fly on the hood at
21    all?
22 A. No.
23 Q. Okay. Does he fall off the bike?
24 A. Yes.
25 Q. Okay. So immediately when he hits the car, he flies

**Colin McCabe**

36

1     off the bike, right?
2  A. Well, the bike goes down. He ends up on his feet.
3     The bike goes down. He starts like coming backwards
4     off the bicycle.
5  Q. Well, let's kind of take this step-by-step here. So
6     he hits the front wheel of his bike to the wheel
7     well of your front wheel well of the car, right?
8  A. That's correct.
9  Q. Does he get off of the bike after the impact or does
10    he fall, if you know?
11 A. I'm not sure what you're asking.
12 Q. Okay. Does he fall to the ground?
13 A. No.
14 Q. Okay. So he hits the car. Then what does he do?
15 A. The bike falls to the ground. He ends up staying on
16    his feet. I mean he goes forward, hands up -- with
17    his hands on the hoodish and then he ends up staying
18    on his feet. As I'm getting out of the car, he
19    starts backing up like to try and keep his balance.
20 Q. So what contact with his body do you see with the
21    car? Hands, right?
22 A. Yes.
23 Q. Was it arms, elbows, shoulders?
24 A. I'm not sure.
25 Q. Do you know if it his stomach or chest came in

**Colin McCabe**

37

1  contact with it?
2  A. I don't.
3  Q. Do you know if his head came in contact with
4     anything?
5  A. I don't.
6  Q. You don't?
7  A. No.
8  Q. Okay. So after this collision occurs, the bike
9     falls to the ground?
10 A. That's correct.
11 Q. But he stays on his feet?
12 A. Yes.
13 Q. Okay. Where does the bike end up in relationship to
14    the car?
15 A. Laying next to it.
16 Q. Any part of the bike underneath the car?
17 A. I don't know.
18 Q. In any of the seconds after that impact, your
19    testimony is Mr. Laskey did not fall to the ground,
20    correct?
21 A. That's correct.
22 Q. You didn't see him fall on his bike, correct?
23 A. No.
24 Q. So your testimony is that the bike falls and he's
25    standing on his two feet essentially?

**Colin McCabe**

38

1  A. Well, he's losing his balance, but I mean he
2     maintained control pretty much.
3  Q. Okay. So then what happens?
4  A. I exit my car.
5  Q. Does your partner exit?
6  A. I believe -- she does at some point. I'm not sure
7     when she did.
8  Q. Gun drawn for you?
9  A. No.
10 Q. Did you ever draw your gun?
11 A. No.
12 Q. Did your partner draw her gun?
13 A. No.
14 Q. Did you ever see her draw her gun?
15 A. No.
16 Q. Any need to draw a gun?
17 A. No.
18 Q. Before I forget about it, let's talk about the video
19    a little bit. Have you ever watched a video of
20    this?
21 A. No.
22 Q. Okay. Was your car equipped with video?
23 A. Yes.
24 Q. Are you supposed to check the video equipment as the
25    driver at the beginning of every shift?

**Colin McCabe**

39

1  A. Yes.
2  Q. Do you fill out a form saying you checked it and
3     it's working order?
4  A. Just so you note it on your log sheet.
5  Q. Okay. Was your video working on this day?
6  A. Yes.
7  Q. Rear and front recording, correct?
8  A. I don't know. I'm not sure what system we had at
9     that time. So I'm not sure if we had a back seat
10    camera then.
11 Q. Okay.
12 A. That was three years ago. We've switched systems
13    and our current system we have now has back seat
14    camera and that turns on when we turn it on. The
15    old system that we had had a camera like a camera on
16    that once when somebody was in custody, we would
17    turn it around and put it in the back seat. But we
18    had a front seat camera.
19 Q. Okay.
20 A. Front forward camera.
21 Q. But that would only do the hood area, correct?
22 A. Yeah.
23 Q. Okay.
24 A. Yes.
25 Q. How often does that video camera run? Is it running

**Colin McCabe**

40

1  continuously, is it only running when overhead
2  lights are activated, you have to physically
3  activate it, how does that work?
4  A. If it's -- it had to be on the new system. So it's
5     -- it runs all the time at a frame rate of like one
6     frame every four seconds or four frames a second.
7     I'm not sure of the exact statistics, but it's --
8  Q. Well, if it helps you with your testimony, I'll just
9     tell you, and I think your counsel will stipulate,
10    that there appears to be a rear camera that shows
11    somebody in the back seat and a front facing camera.
12 A. Okay. So it's our newer stuff. So it runs at like
13    -- to save space, it runs of not like full frames.
14 Q. Okay.
15 A. Until you activate your overhead lights and then it
16    acts like a DVR and it backs up 30 seconds and then
17    it's full-frame rate from 30 seconds prior and then
18    it runs at full frames like during the incident.
19 Q. So it doesn't erase anything --
20 A. No.
21 Q. -- if you're stopped?
22 A. No.
23 Q. So if you're stopped, it's doing like one frame for
24    every four seconds if your vehicle is not moving?
25 A. It's more than that, but like if you watch that

**Colin McCabe**

41

```
 1   part, it's like glitchy.  It just --
 2 Q. I gotcha.  I'm just trying to understand.  So we'll
 3   just use this four seconds.
 4 A. Okay.
 5 Q. Understanding in the record that we're not saying it
 6   is four seconds, but for purposes of explanation.
 7   So you got maybe four seconds or so for every piece
 8   of segment -- movie segment?
 9 A. Sure.
10 Q. If the vehicle's stationary and not moving, correct?
11 A. If the -- if you haven't turned it on or activated
12   lights.  It's doing this all the time even with the
13   car moving.
14 Q. Okay.
15 A. It does that for the full 12 hours.
16 Q. But then when does it do what we'll call the
17   real-time?
18 A. As soon as you activate the overhead lights --
19 Q. Okay.
20 A. -- it backs up 30 seconds and starts from 30 seconds
21   prior to you activating your lights.
22 Q. But it doesn't erase what was already there?
23 A. No, it just saves the -- the full frames.  'Cause as
24   you're driving around, it's recording full frames,
25   but it only saves like four frames a second.
```

Court Reporting Services
courtreportingservices@ymail.com - (248) 535-8277

**Colin McCabe**

42

```
 1 Q. Okay.
 2 A. If you don't need it like if you didn't activate
 3   your lights.  So it's like a DVR.  It's like you're
 4   watching DVR and then you wanna back up, it records
 5   like the stuff that's behind it until you run out of
 6   time.
 7 Q. So the -- so it does real-time when you activate
 8   your overheads?
 9 A. 30 seconds before that, yes.
10 Q. Yeah.  Would if you're moving and the overheads
11   aren't on and it does this delayed?
12 A. Yes.
13 Q. Okay.  Can you make it -- if the overhead lights
14   aren't on, can you make it record real -- what I'll
15   call real-time?
16 A. Yes.
17 Q. And how do you do that?  A switch?
18 A. You just hit a button, yeah.
19 Q. Okay.  When Mr. Laskey and the squad car connected,
20   do you know if the overhead lights were on?
21 A. I don't.
22 Q. Based upon what you just told me, what would your
23   belief be how it was recording?  Was it doing
24   real-time or was it recording in like the DVR --
25 A. It would have been real-time.  I activated my
```

Court Reporting Services
courtreportingservices@ymail.com - (248) 535-8277

**Colin McCabe**

43

```
 1   overhead lights to go through the intersection.  I'm
 2   sure it would have turned on then.
 3 Q. Okay.  So it was -- your overhead lights were still
 4   on when the contact with Mr. Laskey --
 5 A. I don't know.
 6 Q. -- and the car?
 7 A. If you turn them off, it still -- even if you turn
 8   your overhead lights off, it still -- it still
 9   continues to record.
10        MR. MORRIS:  I'm going to object, asked and
11   answered.
12 Q. (BY MR. CABOT):  And it records audio too?
13 A. Yes.
14 Q. Do you have the ability -- or does an officer have
15   the ability to cut the audio in and out?
16 A. Yes.
17 Q. Okay.  Probably like a button on like a belt pack or
18   something?
19 A. Yes.
20 Q. So we're at the point where Mr. Laskey's bikes on
21   the ground, he's standing on his two feet, you get
22   out of your car, your partner gets out of the car,
23   what happens next?
24 A. I grab his arm.
25 Q. Which arm?
```

Court Reporting Services
courtreportingservices@ymail.com - (248) 535-8277

**Colin McCabe**

44

```
 1 A. The left arm, I believe.
 2 Q. And why did you grab the left arm?
 3 A. Because that was what was closest to me at the time.
 4 Q. Was he trying to run from you?
 5 A. No.
 6 Q. Then why did you touch him?
 7 A. Because we were going to detain him.
 8 Q. Okay.  Did you tell him hey, we wanna talk to you?
 9 A. I mean aside from the other three times?
10 Q. Well, now -- now, he's standing there.  He's not
11   trying to run from you.  Did you say hey, we wanna
12   talk to you?
13 A. No.
14 Q. Okay.  So instead, you just grab his left arm,
15   right?
16 A. Correct.
17 Q. And what -- what happens then?
18 A. I grab him by the arm, he says -- he says he wants
19   to call his lawyer.  We go backwards, I order him to
20   the ground and --
21 Q. Let me stop you there.  You said we go backwards.
22   It is just still you and him at this point or is
23   your partner there?
24 A. It's just me and him I think at that point.
25 Q. Okay.  And he says he wants to call his lawyer, you
```

Court Reporting Services
courtreportingservices@ymail.com - (248) 535-8277

**Colin McCabe**

45

1  say the two of you start to go backward. Do you
2  fall?
3  A. I -- I don't fall. He starts going backwards with a
4  little bit of force and we just put him on his butt.
5  Q. And who put him on his butt?
6  A. I did.
7  Q. Okay. Did you partner was she there?
8  A. Yes.
9  Q. Did she assist in pushing him down?
10 A. I don't know if she had ahold of him at that point
11 or not.
12 Q. Did you ask him to get down on his own?
13 A. No.
14 Q. Why didn't you ask him to get down on the ground?
15 A. Cause it was all -- it all happened real time. We
16 got out, get here --
17 Q. Nothing --
18 A. I ordered him on the ground, but I was like I
19 grabbed him, pulled him backwards as he was falling
20 backwards, and we just set him down.
21 Q. You did order him to the ground?
22 A. Yes.
23 Q. When?
24 A. As I was getting out of the car and grabbed him.
25 Q. Okay. And did he try to get down on the ground?

**Colin McCabe**

46

1  A. He was walking back. We just all did it together.
2  It's all one --
3  Q. So he wasn't --
4  A. -- fluid motion.
5  Q. -- getting down fast enough or what?
6  A. I grabbed ahold of him. He's losing his balance
7  walking backwards and so I set him down.
8  Q. Do you already have ahold of him when you tell him
9  to get down?
10 A. Yes.
11 Q. Okay. So who pushes him to the ground then?
12 A. Me.
13 Q. You and your partner or just you?
14 A. I'm not sure if she was there at that point.
15      MR. MORRIS: Object, asked and answered.
16 Q. (BY MR. CABOT): And how does he land?
17 A. On his butt.
18 Q. Is he giving you a hard time at all?
19 A. No, he's just not being compliant.
20 Q. What does that mean?
21 A. He's not putting his arms behind his back. He's not
22 rolling over like we tell him to.
23 Q. Okay. Well, let's stop there because we haven't got
24 to that point, but up to the point where he sits on
25 his butt, how has he been resistant, if he has?

**Colin McCabe**

47

1  A. Disobeying lawful commands the entire time.
2  Q. Being on the street you say stop, he doesn't, and
3  now you tell him get down, he didn't do it --
4  A. That's correct.
5  Q. -- that's what we're talking about? Okay. But up
6  to this point to the time he gets on his butt, he's
7  not physically resisting you, is he?
8  A. No, he's not assaultive.
9  Q. Okay. He's not trying to flee you, is he?
10 A. Well, he's -- he had failed to stop for the past --
11 Q. But that's --
12 A. -- three minutes.
13 Q. But I'm talking about once you get out of the car,
14 he's not trying to flee, right?
15 A. Well, he's falling backwards at that time. I don't
16 know what he's doing at that point.
17 Q. Well, you indicate falling. So it doesn't mean he's
18 trying to run backwards, does it?
19 A. Well, I'm not sure what his intentions are at that
20 point.
21 Q. Okay.
22 A. That's why I grabbed ahold of him.
23 Q. All right. So you -- maybe you and your partner
24 push him down, your testimony is he lands on his
25 butt, right?

**Colin McCabe**

48

1  A. Yes.
2  Q. Then what happens?
3  A. We order him to roll over. He refuses to roll over.
4  Q. Does he say anything?
5  A. He said he's gonna call his attorney.
6  Q. Okay. Does he say he's not going to roll over?
7  A. No.
8  Q. Does he try to get up?
9  A. He's moving around. He's just not like physically
10 fighting. He's just resisting.
11 Q. How is he moving around?
12 A. Just wiggling. Like pulling his arms in. You know,
13 just actively resisting, but not fighting.
14 Q. Okay. So he says he's gonna call his lawyer, then
15 what happens?
16 A. Once we tell him to roll over and he refuses, we
17 roll him over and with, you know, some minimal
18 effort, we pull -- you know, pull his hands from
19 underneath him and put them behind his back and
20 place him in handcuffs.
21 Q. Was he tensing up?
22 A. Yes.
23 Q. His body weight was on his hands at this point,
24 right?
25 A. He had his hands underneath him. Once we rolled him

**Colin McCabe**

49

1  over, and he was pulling into like a fetal position.
2  Q. The natural -- wouldn't you say that's a natural
3     occurrence when somebody rolls on their stomach or
4     --
5        MR. MORRIS:  Object --
6  Q. (BY MR. CABOT):  Once they roll on their stomach?
7        MR. MORRIS:  Objection, calls for speculation.
8  A. I wouldn't say it's natural.  It's common to resist
9     that way, yes.
10 Q. (BY MR. CABOT):  Or is it common to be protect and
11    land on something other than your bare chest on the
12    ground so its natural tendency a lot of people bring
13    their hands in, don't they?
14       MR. MORRIS:  Again, objection, calling for
15    speculation.
16 Q. (BY MR. CABOT):  Correct?
17 A. Yeah, I don't know.
18 Q. They bring their hands in a lot, don't they?
19 A. Yes, when people are resisting, yes, they bring
20    their hands in, yes.
21 Q. Even when they're not resisting, isn't it a natural
22    tendency when you're on your stomach to bring
23    something underneath you to cushion you?
24 A. No.
25 Q. You don't agree with that?

**Colin McCabe**

50

1  A. No, I do not.
2        MR. MORRIS:  Again, objection, foundation.
3  Q. (BY MR. CABOT):  Is he -- is he pulling his arms
4     away from you?
5  A. He's pulling them in so that we can't put them in
6     handcuffs.  So no, he's not pulling arms away from
7     us, but he's tightening them in under his -- under
8     his body.
9  Q. Okay.  Did anybody put their knee in his back?
10 A. I don't know.
11 Q. Any need to put a knee in the back?
12 A. I didn't, no.
13 Q. Did you see a need to do that?
14 A. Do I see the need?
15 Q. Yeah.
16 A. Oh, it's common when you put people in handcuffs and
17    you're dealing with people on their back so they
18    can't get up.  It's a common practice.
19 Q. Okay.  But there would be no need to jam a knee in
20    his back, would there?
21 A. No, it's not a jamming a knee in the back.  It's
22    just placing your back of your knee across their
23    shoulder blades so that they can't get up.
24 Q. Well, I'm just asking --
25 A. It's a restraint technique.

**Colin McCabe**

51

1  Q. Okay.  But I'm asking to deliberately jam a knee in
2     the back there was no need to do that --
3  A. No.
4  Q. -- in this case, was there?
5  A. There's never a need to do it.
6  Q. And that would be -- that would be excessive,
7     wouldn't it?
8  A. Clearly.
9  Q. Okay.  So just so the record's clear, did you put a
10    knee in his back?
11 A. No.
12 Q. Did you see any other officer put a knee in the
13    back?
14 A. I don't recall.
15 Q. Do you know if any officer put a knee in the back?
16 A. I don't.
17 Q. Okay.  At some point, is he handcuffed?
18 A. Yes.
19 Q. He's handcuffed behind him?
20 A. I'm not sure what that means.
21 Q. Did you cuff -- bring his arms behind him and
22    handcuff him behind his back?
23 A. Yes.
24 Q. Okay.  Who actually cuffs him?
25 A. Oh, I'm not sure.

**Colin McCabe**

52

1  Q. Okay.
2  A. I think I did.
3  Q. Okay.  And then what happens after he's cuffed?
4  A. We stand him up, we talk to him for a little bit,
5     and we put him in the back seat of the police car.
6  Q. At any time prior to you handcuffing him, did you
7     ask for his name?
8  A. No.
9  Q. Did you ask to see an ID?
10 A. No.
11 Q. After he's cuffed, is that when you asked his name?
12 A. Yes.
13 Q. And what name did he give you?
14 A. Mr. Laskey.
15 Q. Okay.  Did he have any type of ID on him?
16 A. Yes.
17 Q. And what did that ID say his name was?
18 A. Laskey.
19 Q. Okay.  Did that match the description of the fellow
20    you had in front of you?
21 A. Yes.
22 Q. Was the arrest continued?
23 A. Yes.
24 Q. Why?
25 A. Because he was under arrest for disobeying a lawful

**Colin McCabe**

53

1  command at that time.
2  Q. Okay. And what --
3  A. Had he stopped, we would have been able to ID him
4     and release him.
5  Q. Okay.
6  A. It would have taken about 15 seconds.
7  Q. But what was the disobeying of the lawful command?
8     When you guys were on the road and you said and he
9     didn't?
10 A. Yes.
11 Q. Okay. Anything else?
12 A. No.
13 Q. Mr. Laskey never gave you a fake name, did he?
14 A. No.
15 Q. Okay. Do you know why one of the counts against him
16    was giving a fictitious name to an officer?
17 A. I don't believe that's the count I have on here. I
18    think we charged him with hindering.
19 Q. Well, let's look at Exhibit No. 2 of Officer
20    Teolis's deposition. I'll have you take a look at
21    that and read count two for me into the record
22    please.
23       MR. MORRIS: I'm going to object. The
24    document speaks for itself.
25       MR. CABOT: Okay.

**Colin McCabe**

54

1  Q. (BY MR. CABOT): Go ahead.
2  A. This is a charging document. Did furnish to a
3     police officer false, forged, fictitious or
4     misleading verbal or written information.
5  Q. Okay. Did he provide you with false or fictitious
6     information?
7  A. No.
8  Q. Do you know why that would be charged against him
9     then?
10 A. We charged him with hindering, which is a city
11    ordinance for like actually resisting an arrest. So
12    I'm not sure how -- I don't have anything to do with
13    that charging document.
14 Q. But you don't have an explanation why it's there, do
15    you?
16 A. Other than the one I gave you, I have no idea.
17 Q. Okay. And what was the explanation you gave me why
18    --
19 A. We charged him with --
20 Q. -- that charge is in there?
21 A. -- hindering.
22 Q. I understand that, but I'm asking count two, can you
23    explain to me why that charge of giving a false name
24    --
25 A. No.

**Colin McCabe**

55

1  Q. -- is on Exhibit 2?
2  A. I don't have anything to do with that charging
3     document.
4        MR. MORRIS: Objection, asked and answered.
5  Q. (BY MR. CABOT): Who's responsible for that charge?
6  A. The court officer would do that.
7  Q. And that would be P.O. Strackbein,
8     S-T-R-A-C-K-B-E-I-N?
9  A. Yeah.
10 Q. And who is he or she?
11 A. He is the court officer.
12 Q. And what does he do? What's his job or her job?
13 A. He handles misdemeanor arraignments and the
14    charging. He gets misdemeanor warrants for the city
15    offenses.
16 Q. Does he get his information from the officers?
17 A. He gets them from the police report. Because we're
18    gone by the time he comes in. So we complete a
19    warrant request and -- and a report and he uses that
20    information to get -- to gain charges -- misdemeanor
21    charges.
22 Q. Okay. Did he ever talk to you about this case?
23 A. No.
24 Q. Did you ever appear at a hearing on the case,
25    testified at any hearing?

**Colin McCabe**

56

1  A. I don't think so.
2  Q. Okay. These auto accidents that you were involving
3     in what's been the nature of those?
4  A. I'm not sure what the question is.
5  Q. Well, you indicated that you were let go from one of
6     the police departments because of a large number of
7     accidents. What are the nature of those?
8  A. The ones in Warren -- or in Walker were I slid off
9     the road and hit a pole while responding to an
10    officer down. The second one I was responding to an
11    apartment fire and I changed lanes in the rain and
12    struck a car that was next to me that I didn't see.
13    And the third one I just hit a parking pole in the
14    parking lot.
15 Q. Ever hit people?
16 A. No.
17 Q. Other than the one time where you hit another car,
18    any other vehicle-on-vehicle accidents that you've
19    been involved in?
20 A. Yes.
21 Q. How many?
22       MR. MORRIS: I'm going to object to relevance.
23 Q. (BY MR. CABOT): Go ahead.
24 A. Aside from the ones I already told you, one, two,
25    three -- three.

**Colin McCabe**

61

1 normal traveling speed for somebody on a bike?
2     MR. MORRIS: Objection, lacks foundation.
3 Q. (BY MR. CABOT): Go ahead.
4 A. It appeared so.
5 Q. Okay. Did Mr. Laskey ever kinda seemed dazed or out
6    of it at all after the impact with the car?
7 A. I don't recall.
8 Q. You did have a gun that day, correct?
9 A. I'm sorry. What?
10 Q. You did have a gun that day?
11 A. He did? No.
12 Q. Did you?
13 A. I had a gun, yes.
14 Q. Your partner had a gun presumably?
15 A. Yes.
16 Q. Did you ever see Mr. Laskey -- did you ever force
17    Mr. Laskey to his knees?
18 A. No.
19 Q. Okay. Any reason to have forced him to his knees?
20 A. No.
21 Q. Okay. Do you think that would be excessive in this
22    case to force him to his knees?
23     MR. MORRIS: Objection.
24 Q. (BY MR. CABOT): Go ahead.
25     MR. MORRIS: Objection, form, go ahead.

**Court Reporting Services**
courtreportingservices@ymail.com - (248) 535-8277

**Colin McCabe**

62

1 A. Oh, I'm sorry. What was the question again?
2 Q. (BY MR. CABOT): Would you agree it would be
3    excessive in this case to force him to his knees?
4 A. No.
5 Q. Why not?
6 A. He was going to go to the ground. We were ordering
7    him to ground. Whether he went forward to his knees
8    or backwards to his butt, but in this case, he went
9    backwards to his butt. Either way would have been
10    fine.
11 Q. Would if he was -- would if he was attempting to get
12    down on his knees or get down as you instructed, but
13    he wasn't going fast enough and you pushed him down,
14    is that appropriate?
15 A. No, it's not appropriate.
16 Q. It's excessive, wouldn't it be?
17 A. Yes.
18 Q. And at any time from beginning to end, did he ever
19    complain of any injuries, any problems he was having
20    with eyesight, vision, anything?
21 A. No.
22 Q. When you were originally driving next to Mr. Laskey,
23    once you turned around, did the u-turn, and you were
24    along side of him, how long do you think you were
25    along side of him time wise?

**Court Reporting Services**
courtreportingservices@ymail.com - (248) 535-8277

**Colin McCabe**

63

1 A. 10 seconds maybe.
2 Q. Okay. And then you turned -- made that left turn
3    and stopped?
4 A. Yes.
5 Q. Okay.
6     MR. CABOT: I have nothing further.
7             EXAMINATION
8 BY MR. MORRIS:
9 Q. I have a few follow-up questions for you. Based on
10    the testimony you've given, how quick or what do you
11    think the time was from the time of impact of the
12    car to the time you got out of the vehicle, if you
13    know?
14 A. Just a couple seconds. I mean as soon as he hit the
15    car, I was getting out -- I mean I was getting out
16    to grab him.
17 Q. How quick -- from the time of impact from the time
18    you actually had him placed in handcuffs, what would
19    be your -- how long? Do you know?
20 A. Maybe a minute or so.
21 Q. And from the time of impact to the time when he was
22    reaching into his pocket, what timeframe do you
23    think that would have been?
24 A. Maybe 10 seconds.
25 Q. So in real-time, this was happening fairly quickly?

**Court Reporting Services**
courtreportingservices@ymail.com - (248) 535-8277

**Colin McCabe**

64

1 A. Yes.
2 Q. In your experience as a police officer, I know I
3    walked in as you were doing it, roughly -- law
4    experience roughly 14 years at this point, correct?
5 A. Yes.
6 Q. In your experience in the law in 14 years, what is
7    your experience when somebody's reaching in for a
8    pocket -- in their pocket as you're trying to make
9    contact with them?
10     MR. CABOT: Object to form, speculation, go
11    ahead.
12 A. For us, it's a safety -- officer safety issue as we
13    treat anything -- any movements like that like as if
14    they were getting a weapon.
15 Q. (BY MR. MORRIS): So at that point, it would be
16    reasonable for you to have a heightened security,
17    correct?
18 A. Yes.
19 Q. When you received the call from dispatch regarding a
20    peeping Tom, do you remember them identifying a
21    vehicle or anything along those lines of the person?
22 A. They just said no vehicle was seen.
23 Q. Were you ever subpoenaed in this criminal matter?
24 A. I don't remember, sir, what happened -- what the --
25    what happened with the criminal case.

**Court Reporting Services**
courtreportingservices@ymail.com - (248) 535-8277

Colin McCabe

65

1  Q. You don't remember if you had to go to court or
2     subpoenaed for this matter?
3  A. I don't.
4  Q. And I believe you said you charged him with
5     hindering, correct?
6  A. Correct.
7  Q. And opposing counsel asked you to read Exhibit 2,
8     which looks like a warrant request, correct?
9  A. Correct.
10 Q. And you had nothing to do with the issuance of the
11    warrant, correct?
12 A. Correct.
13 Q. You only had the responsibility of giving him the
14    charge of hindering, correct?
15 A. Correct.
16 Q. So your arrest was based on hindering and not
17    anything else?
18 A. Our arrest is based on disobeying a lawful command
19    and then the act of him like failing to comply with
20    us and resisting our -- him putting on handcuffs is
21    where the hindering came in.
22        MR. MORRIS:  All right, at this point, I think
23    I'd like to go off the record, call and make sure --
24        MR. CABOT:  Let me just ask another question
25    or two.

**Court Reporting Services**
courtreportingservices@ymail.com - (248) 535-8277

Colin McCabe

66

1              RE-EXAMINATION
2  BY MR. CABOT:
3  Q. Can you explain to me or have any idea how count two
4     on Exhibit 2 of your -- of Teolis's dep would have
5     been there, i.e., giving a fake name?  Do you have
6     any idea how that might get there?
7  A. No, we charged obstruct.
8  Q. Okay.  And did you ever tell Mr. Laskey to get his
9     hands out of his pocket?
10 A. I don't recall.
11        MR. CABOT:  I have nothing further.
12        MR. MORRIS:  Let me just call and make sure I
13    wasn't -- she had any follow-up questions.
14        MR. CABOT:  Okay.
15        MR. MORRIS:  Since I wasn't here for the
16    beginning.
17        MR. CABOT:  Oh, okay.
18        MR. MORRIS:  And then that way we'll be done
19    and on our way.
20            (Off the record at 12:55 p.m.)
21            (Deposition concluded at 1:01 p.m.)

**Court Reporting Services**
courtreportingservices@ymail.com - (248) 535-8277